UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| JASON BLAKE BRYANT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:17-CV-00097-JRG-CRW |
| | ) | |
| TONY C. PARKER and KEVIN | ) | |
| GENOVESE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Through counsel, Jason Blake Bryant (Petitioner), a prisoner in the Turney Center Industrial Complex (TCIX) in Only, Tennessee, brings this authorized second or successive petition for a federal writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement under 1998 judgments of convictions issued by the Greene County, Tennessee Criminal Court [Doc. 1-2].[1] Petitioner claims that his life sentence without parole is unconstitutional in light of *Miller v. Alabama*, 567 U.S. 460 (2012) [Doc. 1-1]. More specifically, Petitioner asserts that, under *Miller*, which was made retroactive by *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), his sentences of life without the possibility of parole for offenses committed when he was a juvenile are illegal and presumptively violate the Eighth Amendment's proscription of cruel and unusual punishments [Doc. 1-2 at 5 and 23].[2]

TCIX Warden Kevin Genovese has filed a response, arguing that habeas corpus relief is unwarranted because Petitioner's claim has been procedurally defaulted and is also meritless [Doc.

---

[1] The petition incorrectly states that the judgments were entered in the Greene County Circuit Court [Doc. 1-2 at 1].

[2] In this opinion, the page number citations to documents in the record refer to the ECF page numbers, not the Bates-stamped page numbers cited by the parties and identified as "Page ID #".

49].  In support of his arguments, Respondent Warden has submitted several notices of filing with attached copies of the state court record [Docs. 41-45, 47-48].  Petitioner has replied to that response [Doc. 52].  Having considered the parties' submissions, the arguments therein, and the state court record, the Court finds that the petition is untimely and procedurally defaulted and, alternatively, without merit.

## I.  PROCEDURAL HISTORY

In 1998, Petitioner was convicted, pursuant to his guilty pleas, of three counts of first-degree murder committed when he was 14 years old, receiving, for these crimes, three consecutive sentences of life without the possibility of parole.  In 2000, Petitioner's convictions were affirmed on direct appeal. *State v. Howell*, 34 S.W.3d 484 (Tenn. Crim. App. 2000).[3] Permission to appeal was denied on September 25, 2000 [Doc. 47-15].

Petitioner then challenged his convictions by filing a petition under the Tennessee Post-Conviction Procedure Act. *Bryant v. State*, No. E2002-00907-CCA-R3PC, 2004 WL 443414 (Tenn. Crim. App. Mar. 11, 2004).  After holding an evidentiary hearing on the claims, the trial court denied the petition and the denial was affirmed on appeal.  *Id.*, 2004 WL 443414, at *2. Petitioner's request for permission to appeal also was denied. *Id.*, 2004 WL 443414, at *1.

Petitioner next filed an application for habeas corpus relief under 28 U.S.C. § 2254 in this Court which, ultimately, was dismissed as untimely. *Bryant v. Carlton*, No. 2:05-CV-151, 2007 WL 2263067 (E.D. Tenn. Aug. 3, 2007).  More than a decade later, Petitioner filed this authorized, second § 2254 application.

---

[3] The lead appellant, Karen R. Howell, was Petitioner's co-defendant and she too was a juvenile at the time the murders were committed.  Ms. Howell also has pending before the Court an authorized second or successive § 2254 petition that relies on *Miller* and *Montgomery*.  *See Howell v. Lebo*, No. 2:18-CR-109 (E.D.Tenn. filed July 11, 2018).

## II.  FACTUAL BACKGROUND

On April 6, 1997, Petitioner and five acquaintances were on their way from their homes in Pikeville, Kentucky, to New Orleans, Louisiana. Before leaving on their trip, they acquired two weapons, a 9mm pistol and a .25 caliber pistol. After departing, they realized that their car would not make the drive to New Orleans, and they discussed stealing a car from a parking lot or a dealership. At an interstate rest stop in Greene County, Tennessee, they encountered the Lillelid family of four, which included Vidar, his wife Delfina, six-year-old daughter Tabitha, and two-year-old son Peter. The Lillelids were Jehovah's Witnesses, and Mr. Lillelid approached two members of the group to discuss his religious views. At some point, one of the men in the group, Joseph Risner, pulled out a gun and forced the Lillelids into the family's van.

Mr. Lillelid drove the van onto the interstate, with the still-armed Risner in the front passenger seat and the other Lillelids, Petitioner, and two co-defendants riding as passengers. The rest of the group followed in the car. Risner directed Mr. Lillelid to a secluded road at the next exit. The Lillelids were ordered out of the van, lined up in front of a ditch, and shot. The shooting ended in the deaths of the father, the mother, and the daughter. The son was critically injured as a result of two small caliber gunshot wounds fired into his head and back. The identity of the shooter is disputed by the participants, but the other facts of the shooting are not.

The group then decided to drive to Mexico, where they were eventually apprehended in the Lillelid van. Some of the group had in their possession articles belonging to the Lillelids. After being returned to Tennessee, all participants were charged with the Lillelid murders, and the State provided notice that the death penalty would be sought for the four adult participants. All defendants, including Petitioner and Howell, entered into an all-or-none package plea deal, and pled guilty to three counts of felony first-degree murder and one count of attempted first-degree

murder, and other crimes related to those murders and attempted murder. All defendants received sentences of life without the possibility of parole.

## III. DISCUSSION

Petitioner's authorized second § 2254 petition is predicated solely on the *Miller* claim. The Court agrees with Respondent Warden that Petitioner is not entitled to habeas corpus relief on his claim, though it first will address an issue not raised by the Warden—whether Petitioner's claim is timely.

### A. Timeliness

A court can sua sponte raise the issue of timeliness of a state prisoner's habeas corpus petition. *See Wood v. Milyard*, 566 U.S. 463, 472 (2012); *Day v. McDonough*, 547 U.S. 198, 209 (2006). The Court chooses to do so here.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified in 28 U.S.C. § 2241, amended the federal habeas corpus statutes and added a one-year statute of limitation to regulate the time for filing an application for a federal writ of habeas corpus. The AEDPA establishes "a tight time line, a one-year limitation period," *Mayle v. Felix*, 545 U.S. 644, 662 (2005), that begins to run from the latest of four dates: (1) the conclusion of direct review; (2) the removal of an impediment created by unconstitutional State action which prevented a petitioner from filing a habeas corpus petition; (3) when a petition assert a constitutional right, newly recognized by the Supreme Court and made retroactively applicable to collateral review cases; or, (4) the date on which the facts supporting the claim or claims presented could have been discovered earlier through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D). The statute also contains a time-tolling feature. The time is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . .

. ." 28 U.S.C. § 2244(d)(2). The third date is the relevant one here because the authorized petition asserts a newly-recognized right as the sole ground for habeas corpus relief.

Petitioner filed this second habeas corpus petition on May 18, 2017, the day after he received authorization from the Sixth Circuit to file it [Docs. 1, 1-1]. Petitioner's claim is predicated on *Miller v. Alabama*, 567 U.S. 460 (2012), which held that imposing sentences of mandatory life without parole upon defendants who were under the age of 18 at the time of their crimes violates the Eighth Amendment's proscription of cruel and unusual punishments. 567 U.S. at 465. *Miller* was decided on June 25, 2012; thus, any § 2254 *Miller* claim would have had to have been filed in this Court by June 25, 2013, absent statutory tolling.[4] Petitioner filed his motion for an order authorizing him to file a second or successive § 2254 petition in the Sixth Circuit on January 23, 2017 [Doc. 1 at 1].

Accordingly, Petitioner's motion seeking authorization to file a second or successive § 2254 petition was filed after the lapse of the one-year period to raise his *Miller* claim, and hence his second § 2254 petition is untimely. Although Petitioner maintains, in his reply, that he filed a motion to reopen his post-conviction petition on January 23, 2017—the same date he filed in the Sixth Circuit his motion to authorize the Court to consider his second § 2254 petition [Docs. 52 at 2, 52-1], that submission does not invoke statutory tolling because the motion to reopen was filed

---

[4] Petitioner, at times, characterizes his claim as a *Miller/Montgomery* claim. To the extent that Petitioner is suggesting that AEDPA's one-year statute started running on the date *Montgomery* was issued, the Supreme Court held in *Dodd v. United States*, 545 U.S. 353 (2005), that the time starts on the date on which the right is initially recognized (as occurred in *Miller*), not on the date the right is made retroactive (as happened in *Montgomery*). *Dodd* involved a federal prisoner's motion to vacate under 28 U.S.C. § 2255, but that case has been applied to a state inmate's § 2254 petition raising a *Miller* claim. *Hunt v. Dowling*, No. 18-CV-0440, 2019 WL 2167413, at *3 (N.D. Okla. May 17, 2019) ("Under *Dodd*, Petitioner's one-year limitation period commenced on June 26, 2012, the day after *Miller* was decided, and expired on June 26, 2013."). The Supreme Court recognized in *Dodd* that its ruling had the "potential for harsh results in some cases," but held that it "was not free to rewrite the statute that Congress has enacted." 545 U.S. at 359. What these cases mean is that *Montgomery* did not recognize a new constitutional right and that it therefore cannot start a new statute of limitation.

well after the AEDPA statute of limitation had lapsed. Put simply, by the time Petitioner filed his motion to reopen his state collateral proceedings in the Greene County Tennessee Criminal Court [Doc. 52-1], the AEDPA's clock on the *Miller* claim had already stopped and there was no time left to toll. *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) ("The tolling provision does not . . . 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."); *Hargrove v. Brigano,* 300 F.3d 717, 718 n. 1 (6th Cir. 2002).

Nonetheless, the AEDPA statute of limitation is not jurisdictional and is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010). Equitable tolling "allows courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000)). To demonstrate that equitable tolling is warranted, a petitioner must show "(1) that he has been pursuing [his] rights diligently, and (2) that some extraordinary circumstance stood in [his] way and prevented timely filing." *Id.* at 649. "[T]he doctrine of equitable tolling is used sparingly by federal courts" and [t]he party seeking equitable tolling bears the burden of proving he is entitled to it." *Robertson*, 624 F.3d at 784 (citations omitted).

Review of the § 2254 application and supporting memorandum reveals no extraordinary circumstance to justify Petitioner's failure to present his *Miller* claim to this Court in a timely fashion. Petitioner's failure to allege any facts to suggest the existence of an extraordinary circumstance, such as serious attorney misconduct, *see Holland*, 560 U.S. at 652, including

attorney abandonment, *see id.* at 659 (Alito, J., concurring in part and concurring in the judgment), or mental incompetence, *see Lawrence v. Florida*, 549 U.S. 327, 338 (2007 (no extraordinary circumstance where petitioner "made no factual showing of mental incapacity"), leads the Court to conclude that no such a circumstance is present here.

The Court therefore finds that equitable tolling is not appropriate in this case and that Petitioner's *Miller* claim is untimely. Even if the *Miller* claim, however, is not time-barred by the AEDPA limitation statute, it has been procedurally defaulted.

## B. Exhaustion/Procedural Default

### 1. Governing Law

A federal court cannot grant a state prisoner's petition for a writ of habeas corpus unless: the petitioner has exhausted his available state court remedies; there is an absence of available state corrective process, or circumstances exist that render such process ineffective. 28 U.S.C. § 2254(b)(1). The exhaustion rule requires total exhaustion of state remedies. *Rose v. Lundy*, 455 U.S. 509, 518-19 (1982) (noting that "a rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error"), *id.* at 522 (stating that "a total exhaustion rule promotes comity and does not unreasonably impair the prisoner's right to relief").

Exhaustion requires a petitioner to have made a fair presentation of each claim for disposition to all levels of appropriate state courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (observing that a petitioner is obliged to fairly present his claim in each appropriate state court, so as to provide the State with the necessary opportunity "to pass upon and correct alleged violations of . . . federal rights"); *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999) (explaining that exhaustion

entails submission of a federal claim through "one complete round of the State's established appellate review process").

"An exception [to the exhaustion requirement] is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). A state can waive exhaustion if it does so expressly. 28 U.S.C. § 2254 (b)(3). It is a petitioner's burden to show exhaustion of available state court remedies. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Procedural default is an extension of the exhaustion doctrine. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (observing that "[i]n habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default"); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) ("The requisite exhaustion may nonetheless exist, of course, if it is clear that [a petitioner]'s claims are now procedurally barred under [state] law."). A petitioner who is barred by a state procedural rule from returning with his claim to the state courts has committed a procedural default. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a petitioner has met the technical requirements of exhaustion (i.e. there are no state remedies left to exhaust) and therefore is deemed to have exhausted his state remedies, but to have done so by way of a procedural default. *Coleman*, 501 U.S. at 732. Federal review of a procedurally defaulted claim is foreclosed, unless the habeas petitioner shows cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation, *Gray*, 518 U.S. at 162, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S at 750.

## 2.	Analysis of Exhaustion & Procedural Default Arguments

Respondent maintains that Petitioner has failed to exhaust his *Miller* claim by failing to raise it in state courts; thereby he has procedurally defaulted the claim; and, moreover, has conceded that the claim is procedurally defaulted because he never presented it to the state courts [Doc. 49 at 6 (citing Doc. 1-2 at 5, 45, 51)].   The Court finds that Petitioner has made no such concession.   It is true that each of the pages of the record cited by Respondent contains Petitioner's acknowledgment that he did not present his claim to the state courts [Doc. 1-2 at 5, 45, 51].   It is also true that Petitioner's acknowledgment is accompanied by his assertion that the failure to exhaust is excused by: (1) the issuance of a new rule of constitutional law subsequent to his first habeas petition; (2) "the lack of a meaningful opportunity to seek state post-conviction relief;" and (3) the absence of available relief (due to a state procedural time-bar) [*Id.*].   In Petitioner's reply, he switches positions and contends for the first time that he, in fact, raised his *Miller* claim in a motion to reopen his post-conviction petition and that, in response, the State took certain stances with respect to the claim that, in effect, estops them from asserting procedural default [Doc. 52 at 2].[5]

Attached to Petitioner's reply are copies of Petitioner's "Protective Motion to Reopen His Post-Conviction Petition," filed on January 23, 2017, in the Greene County Criminal Court, and the State's response to the motion to reopen [Docs. 52-1, 52-2].[6]   Petitioner supplies no information as

---

[5] Petitioner maintains that he "indicated as much on the face of his cover sheet in this case," pointing to the question posed in Paragraph VIII. RELATED CASE(S) IF ANY," to which he responded, "Greene Cnty. Circuit Court, Docket Number 97-CR-411E/01-CR-161" [Doc. 52 (referring to Doc. 1-3, Civil Cover Sheet)].   Petitioner's allegation is rejected because a cover sheet is not a pleading.   The prefatory instructions on the top of the civil cover sheet make that point clear by instructing that "[t]he JS 44 civil cover sheet and the information contained therein neither replace nor supplement the filing and service of pleadings or other papers as required by law . . . ." [Doc. 1-3].   One court has explained that "the Federal Rules require an application for habeas relief to be in the form of a petition for habeas corpus and that the civil cover sheet does not replace the filings . . . ." *Joseph v. Chadbourne*, 345 F. Supp. 2d 73, 75 (D. Mass. 2004).

[6] On that same date, Petitioner also filed in the Sixth Circuit a motion for authorization to file a second or successive § 2254 petition.   Available at https://ecf.ca6.uscourts.gov/n/beam/servlet/TransportRoom (as visited on November 25, 2017).

to the outcome of his motion to reopen, nor does he suggest that the mere filing of his motion to reopen in the Greene County Circuit Court is sufficient to exhaust state remedies. Instead, Petitioner's view is that Respondent's assertion in state court that the motion to reopen was time-barred under state law estops Respondent from adopting the contrary position in these federal habeas corpus proceedings.

Petitioner's estoppel argument, however, is negated by the controlling statute. That statute provides that the "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). To state the obvious, Respondent has not expressly waived the requirement; instead he anchors his procedural default defense on Petitioner's failure to exhaust state remedies. Respondent therefore is not estopped from asserting that Petitioner's failure to exhaust his *Miller* claim has resulted in that claim being procedurally defaulted.

The Court also rejects Petitioner's assertion in his reply that Respondent's statute-of-limitation defense advanced in state court in connection with Petitioner's motion to reopen qualifies as a conclusive judicial admission that applies in his federal habeas corpus case [Doc. 52 at 4]. Judicial admissions are binding in the case in which the admissions are made, but not in separate and subsequent cases. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996); *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968). Judicial admissions in Petitioner's state post-conviction motion to reopen therefore are not binding in this federal habeas corpus case. Furthermore, judicial admissions generally apply to facts, not legal theories. *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997). Respondent's assertion that the motion to reopen was filed outside the relevant state statute of limitation was predicated on a legal theory (not a historical fact) as to why the motion did not warrant post-conviction relief.

10

Petitioner next maintains that there is an absence of available state corrective process because he was already time-barred from pursuing state post-conviction relief before *Miller* was held to be retroactive [Doc. 1-2 at 58]. However, Tennessee courts entertained *Miller* claims offered to them by petitioners who sought collateral relief within one year of that decision, or by June 25, 2013. *See Williams v. State*, No. W2013-00555-CCA-R3HC, 2013 WL 5493568, at *1 (Tenn. Crim. App. Sept. 30, 2013); *Darden v. State*, No. M2013-01328-CCA-R3PC, 2014 WL 992097, at *4 (Tenn. Crim. App. Mar. 13, 2014) (observing that the petition was filed within one year of the "the United States Supreme Court's decision in *Miller*, establishing that a mandatory life sentence without parole is unconstitutional for defendants who were juveniles at the time of the offense"); *Perry v. State*, No. W2013-00901-CCA-R3PC, 2014 WL 1377579, at *3 (Tenn. Crim. App. Apr. 7, 2014) (asserting a *Miller* claim in an August 7, 2012, pro se motion to reopen post-conviction petition), *perm. app. denied* (Tenn. Sept. 18, 2014).

Moreover, Tennessee courts have made it clear that, in post-conviction cases, "the statute of limitations begins to run when the new substantive rule is announced, not when a subsequent decision makes that decision retroactive." *Rouse v. State*, No. M201800926CCAR3PC, 2019 WL 3814624, at *5 (Tenn. Crim. App. Aug. 14, 2019) (citing *Dodd v. United States*, 545 U.S. 353, 356-60 (2005)). In addition, the fact that Petitioner waited until a year after the Supreme Court held in *Montgomery* that *Miller* was retroactively applicable to move to reopen his post-conviction case does not mean that he lacked an available state corrective process for his *Miller* claim. Indeed, nearly two years prior to the issuance of *Montgomery*, the Tennessee Court of Criminal Appeals (TCCA) held that *Miller* was retroactive. *See Darden v. State*, No. M2013-01328-CCA-R3PC, 2014 WL 992097, at *10 (Tenn. Crim. App. Mar. 13, 2014) (finding that "the *Miller* rule is a new rule of constitutional criminal law that should be applied retroactively because it forbids the

criminal punishment of a mandatory sentence of life imprisonment without parole for a certain class of defendants because of their status as juveniles").  *Darden* strongly suggests that, had Petitioner filed his motion to reopen within one year of the *Miller* decision, the TCCA would have found *Miller* to be retroactively applicable in Petitioner's case.

Petitioner similarly maintains that it would be futile to return to state courts with his *Miller* claim because of controlling authority from the TCCA.  Petitioner cites to 28 U.S.C. § 2254(b)(1)(B)(ii) which exempts an applicant from the exhaustion requirement where "circumstances exist that render such process ineffective to protect the rights of the applicant" [Doc. 1-2 at 58].  In support of this argument, Petitioner cites among other cases to *Brown v. State*, No. W201500887CCAR3PC, 2016 WL 1562981, at *7 (Tenn. Crim. App. Apr. 15, 2016), explaining that the TCCA, as he reads *Brown*, ignored the required presumption that juvenile life without parole sentences were unconstitutional and held that a sentencing court, contrary to *Miller*, need not consider a specific set of factors but need only consider the age and immaturity of the  juvenile offender.  Reading between the lines, the Court discerns that Petitioner's true argument is that the state courts would deny him relief under *Miller* and *Montgomery* because *Brown* demonstrates that such an outcome on Petitioner's *Miller* claim would be preordained.

Petitioner's belief that advancing his *Miller* claim in state courts would be futile because it would be decided the same as the one offered in *Brown* is not a valid futility argument. Regarding futility, the Supreme Court has explained,

> If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid.

*Engle v. Isaac*, 456 U.S. 107, 130 (1982); *see also Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (rejecting a futility argument that reasoned that a state court had rejected the claim earlier and, thus, the petitioner "would have lost had he presented the same claim") (citing *Engle*, 456 U.S. at 130); *Parker v. Kelchner*, 429 F.3d 58, 63 (3d Cir. 2005) (holding that the exhaustion requirement is not excused merely because a petitioner's claim will likely be denied on the merits in state court) (listing cases). Significantly, the fact that Petitioner decided to present his *Miller* claim to the state courts in his January 23, 2017, motion to reopen undercuts his claim of futility.[7]

The Court finds that Petitioner's reliance on the above exhaustion-requirement exceptions is misplaced; that those exceptions do not apply in this case; and that he is not exempt from the requirement that he exhaust state remedies with respect to his *Miller* claim before seeking federal habeas corpus relief. 28 U.S.C. § 2254(b), (c). Recall specifically that exhaustion requires that a petitioner present his claim to all levels of available state court review. *O'Sullivan*, 526 U.S. at 842. That did not happen here.

Accordingly, Petitioner's *Miller* claim has been technically exhausted, *see Coleman*, 501 U.S. at 732; *see also Castille v. Peoples*, 489 U.S. at 351, and is now procedurally barred, unless he can show cause and prejudice or a miscarriage of justice. *Coleman*, 501 U.S. at 732, 750.

Petitioner denies that he procedurally defaulted his *Miller* claim, and offers no claim of cause. Without a demonstration of cause, the Court need not determine whether actual prejudice

---

[7] That is not to say that Petitioner met the statutory requirements for filing a motion to reopen, as set forth in Tennessee Code Annotated § 40-30-117. That statute provides, in relevant part, that a motion to reopen is available if "(1) [t]he claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial[.]" Tenn. Code Ann. § 40-30-117(a)(1). Clearly, Petitioner did not file his motion to reopen within one year of *Miller*, the case that established the new constitutional right upon which his potential post-conviction claim was based.

resulted. *Engle v. Isaac*, 456 U.S. 107, 129 (1982) (reaffirming "that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause *and* actual prejudice before obtaining relief") (emphasis added). Thus, absent cause, Petitioner has committed an unexcused procedural default of his *Miller* claim.

Similarly, Petitioner does not allege that a miscarriage of justice will ensue if his claim is not reviewed. Nor could he do so because that exception requires "a convincing showing of actual innocence . . . to overcome a procedural bar to consideration of the merits of the[] constitutional claims." *McQuiggin v. Perkins*, 569 U.S. 383, 386, 392 (2013). Petitioner pled guilty to three counts of first-degree murder and the Court finds nothing in the record to suggest that he has ever wavered or retreated from his admissions of guilt in the commission of those offenses. The Court therefore finds federal review of Petitioner's *Miller* claim barred by his unexcused procedural default and his failure to establish a miscarriage of justice.

Alternatively, Petitioner's *Miller* claim fails on its merits.

**C.    *Miller* Claim**

**1.    The Law**

In *Miller v. Alabama*, the Supreme Court held that mandatory sentences of life without the possibilty of parole imposed on defendants who committed capital murders when they were under the age of 18 violated the Eighth Amendment's prohibition on cruel and unusual punishments. 567 U.S. 460, 470 (2012). In so holding, the Court pointed to two of its earlier cases that had explained that "juveniles are less deserving of the most severe punishments" due to" their diminished culpability and greater prospects for reform." *Id.* at 471 (citing *Graham v. Florida*, 560 U.S. 48

(2010), and *Roper v. Simmons*, 543 U.S. 551 (2005)).[8]  Juveniles, as *Miller* reasoned, are

"constitutionally different from adults for purposes of sentencing":

> First, children have a " 'lack of maturity and an underdeveloped sense of
> responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking.
> *Roper*, 543 U.S. at 569, 125 S.Ct. 1183, 161 L.Ed.2d 1. Second, children "are more
> vulnerable . . . to negative influences and outside pressures," including from their
> family and peers; they have limited "contro[l] over their own environment" and
> lack the ability to extricate themselves from horrific, crime-producing settings.
> *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits
> are "less fixed" and his actions less likely to be "evidence of irretrievabl[e]
> deprav[ity]." *Id.* at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. . . .  [T]he distinctive
> attributes of youth diminish the penological justifications for imposing the harshest
> sentences on juvenile offenders, even when they commit terrible crimes. . . .
> [Y]outh matters in determining the appropriateness of a lifetime of incarceration
> without the possibility of parole.

*Id.*, at 471-73.  *Miller* did not foreclose a sentencer's ability to impose a sentence of life without

parole on juvenile homicide offenders, but it did make it clear that individualized sentencing of

such offenders is imperative.  Individualized sentencing means that "a judge or jury must have the

opportunity to consider mitigating circumstances before imposing the harshest possible penalty

for juveniles." *Id.* at 479, 489.

In *Montgomery v. Louisiana*, the Supreme Court held that "*Miller* announced a substantive

rule of constitutional law" that applies retroactively because it " 'necessarily carr[ies] a significant

risk that a defendant . . . faces a punishment that the law cannot impose upon him.'" 136 S. Ct.

718, 734 (quoting *Schriro v. Summerlin*, 542 U.S. at 348, 352 (2004)) (alteration in original).

*Miller*'s new substantive rule, so *Montgomery* observed, was "that sentencing a child to life

without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable

---

[8] "*Roper* established that because juveniles have lessened culpability they are less deserving of the most
severe punishments," whereas *Graham* prohibited juvenile nonhomicide offenders from being sentenced to life
without parole. *Graham v. Fla.,* 560 U.S. 48, 68, 74 (2010).

corruption.' " *Id.* at 734, *see id.* at 726 (observing "that a lifetime in prison is a disproportionate sentence for all but the rarest of children"). *Miller* did not require a finding of fact regarding a child's incorrigibility, but left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 735 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)) (alteration in original).

### 2.  Analysis of *Miller* Claim

First, unlike the mandatory sentencing systems held unconstitutional in *Miller*, Tennessee's sentencing scheme for juvenile offenders affords a jury or judge discretion to set a life sentence with the possibility of parole or a life sentence without the possibility of parole. *See Atkins v. Lee*, No. 209CV02297, 2018 WL 9651089, at *5 and n.6 (W.D. Tenn. Aug. 28, 2018) (observing that in Tennessee, "the available sentences for a juvenile convicted of first degree murder are life imprisonment with and without the possibility of parole") (citing Tenn. Code Ann. § 39-13-204(a) (establishing first-degree murder penalties of death, life with parole, or life without parole) and § 37-1-134(a)(1)(B) (eliminating a death sentence in a case transferred from juvenile court, as was Petitioner's)); *see also Blocker v. Mays*, No. 1:12-CV-374, 2019 WL 4773825, at *6 (E.D. Tenn. Sept. 30, 2019) (observing that Tennessee courts have determined that, *inter alia*, "any life sentence without the possibility of parole is discretionary") (listing cases); *Ray v. Madison Cnty., Tennessee*, 536 S.W.3d 824, 833 (Tenn. 2017) (recognizing that, under state sentencing law "trial judges have broad discretion when fashioning sentences" and are required to use "a case-by-case approach to sentencing").

Indeed, the transcript of the plea-taking and sentencing hearing in Petitioner's case emphasized that, under state law, the sentencer enjoyed discretion to impose either life or life without parole. In its exposition of the law governing Petitioner's sentencing, the trial court cited

16

to Tennessee Code Annotated § 39-14-204 as providing "that in this sentencing hearing, now that the death penalty has been withdrawn by the State, that the possible punishments for each defendant are imprisonment for life without possibility of parole or to imprisonment for life" [Doc. 48-7 at 38]. In the same vein, before the trial court took Petitioner's guilty pleas, it inquired as to whether Petitioner understood that his sentence on each of the three murder counts could be either life without parole or life—the latter of which meant that he would serve 51 years' imprisonment— and that the trial court itself would decide whether his sentence would be life without parole or life [*Id.* at 31-32]. Petitioner responded affirmatively to those questions [*Id.* at 31-32].

It is clear that Tennessee law does not mandate a sentence of life without parole for juvenile offenders[9] and does not "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Miller*, 567 U.S. at 476. Thus, *Miller*, by its own terms, does not apply to Tennessee's sentencing procedures for imposing a discretionary term of life without parole on juvenile defendants. *Miller*, 567 U.S. at 479 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."); *c.f., Brown v. State*, 2016 WL 1562981, at *7 (finding that a sentence of life without the possibility of parole for a juvenile offender "was not mandatory and was not imposed automatically"). Because Tennessee does not "mak[e] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," its sentencing scheme cannot be said to "pose[] too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 479; *id.* at 469 (noting that, under the Eighth Amendment, punishment "should be graduated

---

[9] The juvenile homicide offenders in both *Miller* and *Montgomery* had received mandatory life-without-parole sentences. *Miller*, 567 at 474 (discussing "the mandatory penalty schemes at issue here"); *Montgomery*, 136 S.Ct. at 726 (identifying the petitioner's penalty as a "mandatory life-without-parole sentence").

and proportional to both the offender and the offense").

Second, *Miller* did not preclude a sentence of life without parole for juvenile offenders, but required "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 567 U.S. at 483. Summing up its reasoning, the Supreme Court stated:

> So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. *See, e.g., Graham*, 560 U.S., at 78, 130 S.Ct., at 2032 ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 2400–2401, 180 L.Ed.2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 567 U.S. at 477–78.

Though Tennessee does not mandate a term of life without parole for juvenile offenders, the linchpin in *Miller* that "youth matters" is a tenet of the State's sentencing law for imposition of such a term of imprisonment. In Tennessee, an individualized sentencing procedure, as is called for by both *Miller* and the Eighth Amendment, must precede the imposition of a sentence of life

without parole. *Brown v. State*, 2016 WL 1562981, at *8; *see also Howell*, 34 S.W.3d at 494 (commenting that "[p]rotections against cruel and unusual punishment under the Eighth Amendment to the United States Constitution require an individualized sentence") (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

First, the State must file a pretrial written notice that specifies that it intends to seek a sentence of life without possibility of parole and that sets forth the aggravating circumstance or circumstances upon which it will rely at the sentencing hearing. Tenn. Code Ann. § 39-13-208. Absent a written notice, a verdict of first degree murder will result in a life sentence. *Id.*, § 39-13-208(c); *State v. Dych*, 227 S.W.3d 21, 24 (Tenn. Crim. App. 2006) (modifying a sentence to life with the possibility of parole after 51 years of incarceration where the state failed to file a written notice of its intention to seek a sentence of life without the possibility of parole after it withdrew its intention to seek a death sentence).

Second, a sentence of life without parole may not be imposed unless the sentencer finds that the State has proven beyond a reasonable doubt at least one statutory aggravating circumstance. Tenn. Code Ann. § 39-13-207(c); *Howell*, 34 S.W.3d at 494 (remarking that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39–13–204(i), and the sentence was not otherwise imposed arbitrarily"). Evidence presented at the sentencing hearing may include the nature and circumstances of the crime; the defendant's character, background history, and physical condition, as well as proof that tends to rebut the aggravating circumstances and to establish any mitigating factors. Tenn. Code Ann. § 39-13-204(c).

Mitigating factors that may be offered include evidence to show that the defendant lacked substantial judgment in committing the offense because of his youth. Tenn. Code Ann. § 40-35-113(6). This mitigating factor is not applied based solely on a defendant's age, but instead on "the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." *State v. Adams*, 864 S.W.2d 31, 33 (Tenn. 1993). Moreover, "[t]he potential or lack of potential for the rehabilitation . . . of the defendant should be considered" in determining the length of the sentence. Tenn. Code Ann. § 40-35-103(5). These procedural dictates ensure that the nature of the crime and the background and circumstances of the juvenile offender, particularly his youth and potential for rehabilitation, are taken into account in fixing a sentence of life without parole—as *Miller* requires.

Indeed, those guidelines were in effect when Petitioner was sentenced to life without the possibility of parole. Petitioner was permitted to present any mitigating evidence that he wished to present and the trial judge considered it. Evidence adduced at the sentencing hearing by Petitioner and considered by the trial court included that

> Bryant has an IQ of 85 and, according to tests, the emotional and social skills of an eleven-year-old. He was in the eighth grade at the time of the Lillelid murders. The last school he attended was Millard High School located in Pike County, Kentucky. He was taking educational courses while awaiting trial in the Greene County Detention Center.
>
> Bryant has a history of alcohol and drug abuse. The presentence report indicates that he began to use alcohol as early as three years of age. He reported that he has used marijuana and "other drugs" since the age of nine. At the time of his arrest, Bryant was in a mental health treatment program at Mountain Comprehensive/Creekside in Pikeville, Kentucky.
>
> Bryant's prior record consists of two 1996 offenses, both of which

were handled by the (juvenile) Court of Justice of the Commonwealth of Kentucky. The first charge was that he was beyond the school's control, for which he was ordered to enter a day treatment program after enrollment in Millard High School. He was also found to be a habitual runaway as the result of a joyride to Indiana in his sister's automobile. Bryant was ordered intensive home supervision and was placed in counseling. During his period of supervision, he passed drug screens for a period of two months until the murders of the Lillelid family.

Bryant first met Natasha Cornett in early March of 1997. She picked him up on a street corner in Pikeville, Kentucky, and took him to her home. While there, Cornett, eighteen years of age at the time, supplied him with vodka and bourbon. Bryant and Cornett kissed during this first meeting and Bryant spent the night at Cornett's home. Apparently, Cornett did not learn Bryant was only fourteen years old until the following morning. Bryant claimed that he did not see Cornett again until April of 1997, just before the murders. At their second meeting, Bryant met Joseph Risner, Dean Mullins, and Crystal Sturgill for the first time. Bryant had met Karen Howell a year earlier.

*Howell*, 34 S.W.3d at 499.

In addition to this evidence, Petitioner presented testimony by a forensic psychiatrist who reported that Petitioner had been neglected as a child; that he had had a "marginal" mother; that his parents divorced when Petitioner was 2 or 3; that he was raised by his alcoholic father; that Petitioner was an immature person and more a follower than a leader; and that Petitioner did not seem to be able to grasp the situation at sentencing "where his life and liberty were at stake" because "what concerned [Petitioner] most was whether he was going to have enough time on the telephone [Doc. 48-7 at 124-136]. The forensic psychiatrist expressed his belief that, because of Petitioner's youth, he had not "been contaminated enough to be ruined" as would a 20- to 25-year old in his position and that, because Petitioner had expressed some empathy and remorse about how it must have felt for Peter Lillelid to have been left an orphan, he had some potential for rehabilitation [*Id.* at 137]. Petitioner also offered the testimony of his mother's friend who had

21

picked up Petitioner in Indiana following his joyride in his sister's automobile who stated that Petitioner had told her during the drive back to Kentucky that he was not loved and that his father was an alcoholic [Doc. 48-12 at 249].

After hearing all the evidence regarding Petitioner at the sentencing hearing, the trial court observed as follows:

> I find that you were aggressively urging others on to do things at that time, that you personally carried one of the guns. That, in fact, you were a shooter. I don't know who all were the shooters. I think there was more than one. I have seen no real remorse or emotion displayed by you. I find the evidence shows that you were aggressive in the killings, that you helped use a gun to kidnap the Lillelids in the first place.... You had gunshot residue all over you. You were in the van for two days with Lillelid property all around you and under your feet, including a baby seat and baby's toys. You bragged about the crimes in jail in Arizona. You have a history of drug abuse and a callous attitude.

*Howell*, 34 S.W.3d at 500-01.

Upon Petitioner's appellate challenge to his sentence of life without parole, the TCCA appellate court stated:

> Only 14 years and nine months old at the time of these offenses, Bryant already had a lengthy history of drug and alcohol abuse. He had a juvenile record in Kentucky due to unruly behavior in school and the unlawful taking of his sister's automobile. Bryant became associated with the other defendants through his chance meeting with Cornett, who picked him up on a street corner a few weeks before the murders and took him to her home. Bryant, who described Cornett as involved in a "Satanic thing," informed a friend that there was "some kind of a Manson reunion."

> The greater weight of the evidence was that Bryant, despite his youth, was a leader in the murders of the Lillelid family. There was proof that Bryant was instrumental in the decision to steal a car and that he treated the victims callously as they were driven to the murder scene. Bryant was armed and, according to the other defendants, actually shot each of the victims. While Bryant blamed

> Risner for the murders, the trial court found Bryant "to be a shooter" and observed that he demonstrated no remorse or emotion. There was evidence that Bryant bragged about his participation in the crimes, ordered Howell not to talk, and described the killings as "a rush" which "gives you power."
>
> Clearly, statutory aggravating circumstances were present in each murder. Bryant personally committed mass murder. Tenn.Code Ann. § 39–13–204(i)(12). That factor was properly applied to each of the crimes. There was sufficient evidence to establish that he and the others committed each of the three murders to avoid arrest and prosecution. Tenn.Code Ann. § 39–13–204(i)(6). The murders of Delfina Lillelid and Tabitha Lillelid were "especially heinous, atrocious, or cruel" for the reasons outlined by the trial court. Tenn.Code Ann. § 39–13–204(i)(5). Bryant does not submit any serious challenge to the application of aggravating circumstances. Other than his age, there are few mitigating circumstances which would apply.

*Howell*, 34 S.W.3d at 508-509. Clearly the state court considered Petitioner's age, his background, the mitigating circumstances he presented during his sentencing hearing, and the nature of the crimes he committed. *Miller* requires no more.

Third, the Supreme Court has instructed that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479)), *id.* (explaining that "*Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption").

Here, the sentencer did not explicitly address whether Petitioner's crimes reflected "unfortunate yet transient immaturity" or "irreparable corruption," but as the Supreme Court has explained, "*Miller* did not impose a formal factfinding requirement" with respect to a child's incorrigibility. *Montgomery*, 136 S. Ct. at 735. Petitioner was able to present mitigation evidence;

therefore, unlike the petitioner in *Montgomery*, he was "given the opportunity to show [his] crime[s] did not reflect irreparable corruption." *Id.* at 736-37. On this record, the Court cannot conceive that the sentencing judge could possibly have concluded, after hearing Petitioner's mitigating evidence and viewing the horrendous circumstances of the Lillelid murders, that those crimes were reflective of "unfortunate yet transient immaturity." The record of Petitioner's sentencing hearing and the rulings made therein support that the sentencer decided implicitly that Petitioner is one of those rare juveniles whose crimes manifest irreparable corruption.

### III.    CONCLUSION

For the above reasons, the Court will **DENY** this state prisoner's second application for a writ of habeas corpus and will **DISMISS** this case. The Court will also **CERTIFY** that any appeal from this action would not be taken in good faith. Fed. R. App. P. 24.

### IV.    CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) should Petitioner file a notice of appeal. A petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). Where a court dismisses a § 2254 petition on procedural grounds, a COA will issue upon a showing that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the procedural bar is plain and, thus, the Court finds that reasonable jurists could not find that its ruling on the timeliness of the motion was debatable or wrong. Because reasonable jurists could not disagree with the Court's denial of the § 2254 motion as time-barred

and could not conclude that matter is "adequate to deserve encouragement to proceed further,"

*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), the Court will **DENY** issuance of a COA.

**AN APPROPRIATE ORDER WILL ENTER**.

ENTER:

s/J. RONNIE GREER
_____
UNITED STATES DISTRICT JUDGE